# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

RYAN BONNER
130 Long Lane
Apt. 26
Upper Darby, PA 19082,
on behalf of himself and all others similarly situated,

                        Plaintiff,

      vs.

UNITED STATES OF AMERICA, OFFICE OF
PERSONNEL MANAGEMENT
1900 E Street, NW
Washington, DC 20415-1000; and

KEYPOINT GOVERNMENT SOLUTIONS, INC.
1750 Foxtrail Drive
Loveland, CO 80538,

                    Defendants.

</td><td>

Case No. 1:15-cv-1617


**CLASS ACTION COMPLAINT**


**DEMAND FOR JURY TRIAL**

</td></tr>
</table>

Plaintiff Ryan Bonner, individually and on behalf of all others similarly situated, alleges the following against the United States of America, Office of Personnel Management (the "OPM") and KeyPoint Government Solutions, Inc. ("KeyPoint") (collectively, "Defendants") based upon information and belief[1] except as to the allegations pertaining specifically as to Plaintiff that are based on personal knowledge:

---

[1] Plaintiff's information and belief is based on an investigation (by and through counsel) which included, among other things, a review and analysis of publicly available information, news articles, reports to federal regulators, Senate hearing statements, and additional analysis. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.     The following class action arises as a result of "the most devastating cybersecurity attack in [American] history"[2] comprised of two separate cyber-security breaches into the OPM's system of records announced by the OPM in 2015 and the theft of millions of personnel records containing personal identification information ("PII")[3] and other sensitive personal information of Plaintiff and Class members (the "OPM Breach")—including millions of current, former, and prospective employees and contractors of the federal government (the "Applicants") and certain of their family members and other close contacts (collectively, the "Affected  Individuals").

2.     The OPM is an independent federal government agency that essentially acts as the human resources department of the federal government.   According its website, the OPM manages federal employees' healthcare and insurance systems and their retirement benefits and services.   It also acts as the recruiting and hiring department for approximately 100 federal agencies.   As the recruiting and hiring department, the OPM provides over 90% of the federal government's background investigations—conducting over two million investigations a year.   In its role as the human resources department of the federal government, the OPM is responsible for maintaining detailed records on current, former, and prospective federal employees and contractors.

3.     As part of the OPM's security clearance protocol, certain applicants are required to submit Standard Form 86, a 127-page form that includes detailed personal questions. Thus, many of the millions of personnel records for which the OPM is responsible contain more

---

[2] *Information Technology Spending and Data Security at the Office of Personnel Management*: *Hearing Before the Subcomm. on Financial Services and General Government of the Sen. Comm. on Appropriations*, 114th Cong., (2015) (statement of Sen. Boozman, Member, Sen. Comm. on Appropriations) (hereinafter "Senate Hearing").

[3] The OPM defines PII as information that (1) can be used to discern or trace a person's or entity's identity; and (2) alone, or combined with other information, can be used to compromise the integrity of records relating to a person by permitting access to unauthorized disclosure of these records.

sensitive information than just PII.   According to a 2014 article in *The Washington Post*, applicants who must obtain federal security clearances have to provide the OPM sensitive personal information including, *inter alia*: applicants' financial histories and investment records, children's and relatives' names, foreign trips taken and contacts with foreign nationals, past residences, and names of neighbors and close friends such as college roommates and co-workers.[4]

4.     Plaintiff and Class members provided and entrusted their PII and other personal and/or sensitive data to the OPM for the purpose of gaining employment from the OPM and with the understanding that the OPM and its contractors would safeguard their data against theft and not allow access and misuse of their data as required by federal law.   The Privacy Act affirmatively requires all agencies maintaining a system of records to "establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained."   5. U.S.C. § 552a(e)(10).   Under 5 U.S.C. § 552a(m)(1), "[w]hen an agency provides by a contract for the operation by or on behalf of the agency of a system of records to accomplish an agency function, the agency shall, consistent with its authority, cause the requirements of this section to be applied to such system."

5.     Furthermore, the Federal Information Security Management Act of 2002 and its successor The Federal Information Security Modernization Act of 2014 (collectively "FISMA") require the OPM to "develop[] and oversee[] the implementation of policies, principles, standards, and guidelines on information security, including through ensuring timely agency

---

[4] Ellen Nakashima and Lisa Rein, *Chinese hackers go after U.S. workers' personal data*, THE WASHINGTON POST, July 10, 2014, *available at* https://www.washingtonpost.com/world/national-security/chinese-hackers-go-after-us-workers-personal-data/2014/07/10/92db92e8-0846-11e4-8a6a-19355c7e870a_story.html.

adoption of and compliance with standards promulgated under section 11331 of title 40." 44 U.S.C. § 3553(a)(1); *see also* 44 U.S.C. § 3554(a)(1)(B)(iii). Section 11331 requires that all agencies that maintain information systems adopt information security standards promulgated by the National Institute of Standards and Technology ("NIST") in consultation with the Secretary of Homeland Security. Thus, at all times, the OPM and its contractors are, and were, responsible for establishing safeguards and implementing federal standards for maintaining the security of their system of records.

6.      In order to ensure that all federal agencies maintain adequately secure information systems, FISMA requires each agency to undergo an independent annual evaluation from each agency's Office of the Inspector General. *See id.* at § 3555(b)(1). From at least 2007 through 2014, the OPM's Office of Inspector General ("OIG") has published annual audit reports documenting "material weaknesses"[5] and significant deficiencies in the OPM's information security system responsible for safeguarding the personal data of Plaintiff and the putative Class. The OIG's audit reports put the OPM on notice about weaknesses and deficiencies in the cyber-security of its information technology software systems ("IT Software Systems"). Despite being put on notice that its IT Software systems that collect and preserve massive amounts of Class members' personal and sensitive data did not have sufficient security systems in place and were vulnerable to breach, the OPM failed to take steps to successfully remedy the weaknesses or deficiencies in its protocol and systems.

---

[5] The OIG defines a material weakness as "a severe control deficiency that prohibits the organization from adequately protecting its data." *OPM Data Breach*: *Hearing before the H. Comm. On Oversight and Government Reform*, 114th Cong. (2015) (Statement of Michael R. Esser, Assistant Inspector General for Audits, Office of the Inspector General United States Office of Personnel Management) (noting that in 2007 the OIG identified a "material weakness" related to the OPM's lack of information technology security policies and procedures) (hereinafter "OIG's Prepared Statement").

7.      In its 2014 audit report, the OIG noted that the OPM IT Software Systems *continued to contain numerous cyber-security deficiencies*, including *inter alia*: (1) failure to use Personal Identification Verification Cards ("PIV Cards") for multi-factor authentication in all major IT Software Systems; (2) failure to maintain a mature vulnerability scanning program to find and track the status of cyber-security weaknesses in IT Software Systems; (3) remote access sessions which did not terminate or lock out after the period of inactivity required by federal law; and (4) failure to continuously monitor the security controls of all IT Software Systems. [6]

8.      In addition, the OIG's 2014 audit revealed that 11 of 21 OPM IT Software Systems were operating without "Authorization"—meaning the systems were not vetted for complying with proper cyber-security procedures.   Certain of the unauthorized IT Software Systems include systems in the Human Resource Solutions department and Federal Investigative Services department, which is responsible for facilitating background investigations for suitability and security clearance determinations.   In its report, the OIG stated that any weaknesses in the systems "could potentially have national security implications" and recommended that the "OPM Director consider shutting [the unauthorized systems] down."[7]

9.      Not only has the OPM been aware that the security of its IT Software Systems systematically has been deficient and in violation of federal law, but the OPM has also been aware that its major contractors have been hacked as a result of deficient security measures.   In August of 2014, US Investigation Services LLC ("USIS"), an OPM contractor that provided background investigations, suffered a breach and the private data of thousands of federal

---

[6] *See* Final Audit Report, *Federal Information Security Management Act Audit FY 2014*, U.S. OFFICE OF PERSONNEL MANAGEMENT OFFICE OF THE INSPECTOR GENERAL OFFICE OF AUDITS, Nov. 12, 2014, https://www.opm.gov/our-inspector-general/reports/2014/federal-information-security-management-act-audit-fy-2014-4a-ci-00-14-016.pdf ("FY 2014 Audit").

[7] *Id.* at 10-11.

employees was potentially stolen.[8]  In December of 2014, KeyPoint—which took over USIS's position after the August 2014 breach to handle the bulk of the federal background investigations for OPM—announced that it too had been hacked.[9]

10.     As a result of the KeyPoint hack, the OPM announced that hackers potentially compromised the sensitive personal records of approximately 49,000 federal employees but stopped short of acknowledging the full magnitude of the data breach.  Nathaly Arriola, the OPM's spokeswoman, stated "no conclusive evidence [exists] to confirm sensitive information was removed from the system."[10]

11.     After the USIS and KeyPoint hacks, the OPM chose not to strengthen it cyber-security systems or shut down the unauthorized IT Software Systems containing the most sensitive data.  The OPM made this decision with knowledge that its key contractors had already been hacked and despite being explicitly aware of the deficiencies in its cyber-security measures and the dangers associated with those deficiencies.

12.     On June 4, 2015—just six months after the KeyPoint breach—the OPM announced that its IT Software Systems had suffered a major breach that resulted in the theft of the records of millions of federal employees, contractors, and certain of their family members and close contacts.[11]  In Congressional hearings held after the breach became public, the OPM's then Director Katherine Archuleta ("Director Archuleta") blamed a compromised KeyPoint

---

[8] Christian Davenport, *Embattled contractor USIS pushes back against criticism*, THE WASHINGTON POST, Dec. 5 2014, *available at* http://www.washingtonpost.com/business/economy/embattled-contractor-usis-pushes-back-against-criticism/2014/12/05/84434fb0-7cb2-11e4-b821-503cc7efed9e_story.html.

[9] Christian Davenport, *KeyPoint network breach could affect thousands of federal workers*, THE WASHINGTON POST, Dec. 18, 2015, *available at* http://www.washingtonpost.com/business/economy/keypoint-suffers-network-breach-thousands-of-fed-workers-could-be-affected/2014/12/18/e6c7146c-86e1-11e4-a702-fa31ff4ae98e_story.html.

[10] *Id.*

[11] *OPM to Notify Employees of Cybersecurity Incident* in Latest News, OPM, June 4. 2015, https://www.opm.gov/news/releases/2015/06/opm-to-notify-employees-of-cybersecurity-incident/.

credential as the source of the OPM Breach.[12]   KeyPoint President and Chief Executive Officer,

Eric Hess, contested Director Archuleta's contention, stating: "I would like to make clear that we

have seen no evidence suggesting KeyPoint was in any way responsible for the OPM Breach."

In those same hearings, the OIG blamed the OPM's failure to implement proper and legally

required cyber-security measures as exacerbating the scope of the data breach.[13]

13.     As reported by *CNN*, some investigators of the OPM Breach "believe that after

the KeyPoint [intrusion] last year, OPM officials should have blocked all access from KeyPoint,

and that doing so could have prevented more serious damage."[14]   However, the OPM failed to

take steps to ensure that KeyPoint had the appropriate safeguards in place to protect Plaintiff's

and Class members' data, as required by the Privacy Act, and failed to block access from

KeyPoint after its hack.   Thus, both KeyPoint's cyber-security weaknesses and the OPM's cyber-

security failures caused the massive scope of the OPM Breach.

14.     Moreover, the OPM failed to disclose in a timely or adequate manner the facts

surrounding how the breaches happened, why they happened, who was affected, and precisely

what was stolen.   Information about the scope of the OPM Breach continues to emerge.   On July

9, 2015, the OPM announced that the Social Security numbers and other sensitive data of 21.5

million individuals had been compromised, as well as 1.1 million of the latter individuals'

fingerprint records.[15]   On September 23, 2015, the OPM announced that the subset of individuals

---

[12] *See* Senate Hearing, *supra* (Statement of Director Archuleta, Director, U.S. Office of Personnel Management).

[13] *See* House Hearing, *supra* (Statements of Michael Esser, Assistant Inspector General for Audits, Office of the Inspector General United States Office of Personnel Management).

[14] Evan Perez and Shimon Prokupecz, *First on CNN: U.S. data hack may be 4 times larger than the government originally said*, CNN, June 23, 2015, http://www.cnn.com/2015/06/22/politics/opm-hack-18-milliion/.

[15] *OPM Announces Steps to Protect Federal Workers and Others From Cyber Threats* in Latest News, OPM, July 9, 2015, https://www.opm.gov/news/releases/2015/07/opm-announces-steps-to-protect-federal-workers-and-others-from-cyber-threats/.

whose fingerprints had been stolen had increased to approximately 5.6 million.[16]  The records of the 21.5 million Affected Individuals include: "identification details such as Social Security Numbers; residency and educational history; employment history; information about immediate family and other personal and business acquaintances; health, criminal and financial history; and other details.  Some records also include findings from interviews conducted by background investigators and fingerprints.  Usernames and passwords that background investigation applicants used to fill out their background investigation forms were also stolen."[17]

15.     After the OPM's first announcement that it had been hacked, top OPM officials were criticized by members of the House Oversight and Government Reform Committee as "grossly negligent."[18]  U.S. Representative Jason Chaffetz, chairman of the House Oversight and Government Reform Committee, likened the OPM's lax cyber-security protocol to "leaving all the doors and windows open in your house and expecting that nobody would walk in and nobody would take any information."[19]

16.     Thus, since at least 2007, the OPM has known of significant deficiencies in its cyber-security protocol for its IT Software Systems—responsible for the sensitive data of millions, including Plaintiff and members of the Class—and has failed to take steps to remedy those deficiencies or implement the fixes required by law.  *See* 44 U.S.C. § 3554(b)(6).  The OPM's failure to comply with FISMA and failure to make the changes recommended by the OIG violated FISMA and the Privacy Act, and contributed to the theft of millions of records

---

[16] *Statement by OPM Press Secretary Sam Schuman on Background Investigation Incidents* in Latest News, OPM, Sept. 23, 2015 https://www.opm.gov/news/releases/2015/09/cyber-statement-923/.

[17] *OPM Announces Steps to Protect Federal Workers and Others From Cyber Threats* in Latest News, OPM, July 9, 2015, https://www.opm.gov/news/releases/2015/07/opm-announces-steps-to-protect-federal-workers-and-others-from-cyber-threats/.

[18] *OPM Data Breach*: *Hearing before the H. Comm. On Oversight and Government Reform*, 114th Cong. (2015).

[19] *Id.* (Opening statement of Chairman Jason Chaffetz, Rep., Comm. on Oversight and Government Reform).

containing PII and other sensitive information, thereby damaging over 21 million Affected Individuals, including Plaintiff and members of the Class.  KeyPoint, the OPM's largest contractor responsible for background investigations, also failed to establish adequate safeguards to protect the security of Plaintiff's and Class members' PII and other personal and/or sensitive data.  As a result of Defendants' wrongful conduct, Plaintiff and Class members have suffered and will continue to suffer actual damages and pecuniary losses, including, *inter alia*, costs associated with mitigating the risk of identity theft, such as costs for effective credit monitoring services and identity theft insurance, and fees and other costs associated with re-issuing credentials.

17.     The OPM's conduct violated the Privacy Act and the Administrative Procedure Act, and KeyPoint's conduct constitutes negligence.  Plaintiff requests damages to compensate him and Class members for current and future losses, and injunctive relief to (1) fix the OPM's security protocols, implement the OIG's latest audit recommendations; (2) provide adequate credit monitoring services for a sufficient time period; (3) provide after-the-fact identity repair services and identity theft insurance to protect Class members from fraud or identity theft; and (4) re-issue certain government issued identification and documentation, such as, *inter alia*, Social Security numbers, passport numbers, and government insurance identification numbers.

## II.     PARTIES

18.     Plaintiff Ryan Bonner resides in Upper Darby, Pennsylvania, and is a citizen of the State of Pennsylvania.  From December 2003 to March 20, 2014, Plaintiff worked as a Transportation Security Administration ("TSA") agent at the Philadelphia International Airport. Plaintiff's position with the TSA was characterized as a "National Security Position," which required Plaintiff to obtain a security clearance.  In order to obtain a security clearance for his National Security Position, Plaintiff was required to fill out an Electronic Questionnaire for

Investigations Processing ("e-QIP"), the online version of Standard Form 86 ("SF-86").  The e-QIP required plaintiff to submit PII, including, *inter alia*, his social security number, address, telephone numbers, and information on family members and close acquaintances.  Plaintiff's e-QIP was current and up to date throughout the course of his employment with TSA.  On June 9, 2015, Plaintiff received a letter from the OPM informing him that his personal information was compromised in a KeyPoint breach that occurred before September 2014.  Thereafter, Plaintiff received a second letter from the OPM informing him that his personal information also may have been compromised in a breach of OPM's IT Software Systems.  The second letter detailed what steps the OPM had purportedly taken to protect Plaintiff from any harm.

19.     Defendant OPM is a federal agency with its headquarters at 1900 E. Street, NW, Washington, D.C. 20415.  The OPM handles many aspects of the federal employee recruitment process, including managing federal job announcements, conducting background investigations and security clearances, overseeing federal merit systems, managing personal retirement and health benefits, providing training and development programs, and developing government personnel policies.  As part of the recruitment process, the OPM collects and maintains personal information on current, former, and prospective federal employees' and contractors' and certain of the Applicants' family members and close contacts, including PII, background investigations, and security clearance forms.   The OPM conducts more than two million background investigations annually, provides critical human resources services to other agencies, and audits federal agency personnel practices.

20.     Defendant KeyPoint describes itself as a "leading provider of investigative and risk mitigation services to government organizations, including the U.S. Office of Personnel Management, Customs and Border Protection and Department of Homeland Security."

KeyPoint is a Delaware Corporation and maintains its corporate headquarters in Loveland, Colorado and its Washington, D.C. area headquarters at 8260 Willow Oaks Corporate Drive, Suite 32, Fairfax, VA 22031-4513.  In recent prepared testimony before the House Committee on Oversight and Governance Reform, KeyPoint's President and CEO described KeyPoint's work for the OPM as "provid[ing] fieldwork services for background investigations."[20]  As of September 2014, it was reported that KeyPoint was the largest private security-clearance background investigation firm working for federal agencies.[21]

## III.   JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this lawsuit has been brought as a class action on behalf of a proposed class in excess of 100 members, the aggregate claims of the putative Class members exceed $5 million exclusive of interest and costs, and one or more of the members of the putative Class is a citizen of a different state than Defendants.

22.     This Court also has subject matter jurisdiction over the federal claim in this action pursuant to 28 U.S.C. § 1331, and it also has subject matter jurisdiction over the Class's common law claim in this action pursuant to 28 U.S.C. § 1367.

23.     This Court also has subject matter jurisdiction over the Privacy Act of 1974 claim pursuant to 5 U.S.C. § 552a(g)(1).

24.     This Court has personal jurisdiction over the OPM because the OPM maintains its headquarters in the District of Columbia, regularly conducts business in the District of Columbia,

---

[20] *OPM Data Breach II: Hearing before the H. Comm. On Government Oversight and Reform*, 114th Cong., (2015) (Statement of Eric Hess, Chief Executive Officer, KeyPoint).

[21] *KeyPoint Government Solutions, Nation's Largest Provider of Security-Clearance Investigation Services to the U.S. Federal Government, Accelerates National Recruiting Initiative*, PRN NEWS WIRE, Sept. 19, 2015, http://www.prnewswire.com/news-releases/keypoint-government-solutions-nations-largest-provider-of-security-clearance-investigation-services-to-the-us-federal-government-accelerates-national-recruiting-initiative-275720981.html.

has sufficient minimum contacts with the District, and much of the relevant conduct occurred in the District of Columbia.

25.     This Court has personal jurisdiction over KeyPoint because it conducts significant business in the District of Columbia, has sufficient minimum contacts with the District, and much of the relevant conduct occurred in the District of Columbia.

26.     Venue is proper in this District under 28 U.S.C. § 1391 because the OPM is headquartered in this District and a substantial part of the events and omissions giving rise to Plaintiff's and Class members' claims occurred in this District.

27.     Venue is also proper in this District under 5 U.S.C. § 552a(g)(5) and 5 U.S.C. § 703.

## IV.     FACTUAL ALLEGATIONS

### A.     The OPM is Responsible for the Collection and Storage of a Substantial Amount of Confidential and Sensitive Personnel Records

28.     As the federal government's civil services manager, the OPM has the following duties: (l) managing job announcement postings and setting policies on government-wide hiring procedures; (2) conducting background investigations for prospective employees and security clearances across the government; (3) upholding and defending the merit system in the federal civil service; (4) managing pension benefits for retired federal employees and their families and administering health and other insurance programs for federal employees and retirees; (5) providing training and development programs and other management tools for federal employees and agencies; and (6) taking the lead in developing, testing, and implementing government-wide policies relating to personnel issues.

29.     In fulfilling the above enumerated duties, the OPM collects, stores, and maintains the personal data of millions of federal employees and contractors.  According to the OPM's

*Guide to Personnel Recordkeeping*, it stores and manages federal employees' personal data in

the eOPF.[22]  The eOPF is an IT Software System that provides on-demand web-based access to

personnel folders and 24/7 concurrent access to personnel information by human resources staff

and employees.  It contains employee performance records, employment history, employment

benefits, federal job applications (which include social security numbers and address

information, among other things), resumes, school transcripts, documentation of military service,

and birth certificates.

30.     Another of the OPM's major duties is providing investigative service products for

approximately 100 federal agencies.  Its Federal Services Investigation department manages and

oversees 90% of all of the federal government's background investigations for federal employees

and contractors that require security clearances.  The background investigation toolset, which

includes a massive amount of the Affected Individuals' confidential data, is called EPIC—an

acronym based on its major components:

- "**E**," for the e-QIP system—a "Web-based" automated IT Software System designed
  to process standard investigative forms used when conducting background
  investigations.  The e-QIP system purports to provide a "secure internet connection to
  electronically enter, update, and transmit [applicants'] personal investigative data
  over a secure Internet connection to a requesting agency."

- "**P**," for the Personal Investigations Processing Systems ("PIPS")—a background
  investigation case management IT Software System that handles individual
  investigation requests from agencies.   PIPS contains the Security/Suitability

---

[22] Archive, *The Guide to Personnel Recordkeeping*, OPM, at Chapters 1, 3, Sept. 2008,
http://archive.opm.gov/feddata/recguide.pdf.

Investigations Index ("SII")—a master record of background investigations conducted on government employees.

- "**I**," for Imaging—which allows users to view digitalized paper case files such as surveys, questionnaires, written reports, and other images stored in the software system.

- "**C**," for the Central Verification System ("CVS")—the "mother lode" of background investigation data. CVS contains "information on security clearances, investigations, suitability, fitness determinations Homeland Security Presidential Directive 12 ("HSPD-12") decisions,[23] PIV Cards, and polygraph data."

31.     Certain portions of EPIC are so sensitive that they are housed at Fort Meade—the home of the Defense Information Systems Agency and the National Security Agency—and contractors who support them require Top Secret clearances.

32.     The CVS also contains the SF-86, the 127-page form that each individual who is being considered for federal security clearance must submit. When filling out the SF-86, federal security applicants are required to submit, *inter alia*, the following information: financial histories and investment records; children's and relatives' names; foreign trips taken and contacts with foreign nationals; past residences; Social Security numbers; and names of neighbors and close friends such as college roommates and coworkers.[24] The OPM maintains the latter information in its IT Software Systems, which—according to former OPM Director Katherine Archuleta, who resigned in July 2015 as a result of the public announcement of OPM's data

---

[23] HSPD-12 decisions are the background checks required for employees and government contractors to gain access to federal facilities. *See* Sean Gallagher, *"EPIC" fail—how OPM hackers tapped the mother lode of espionage data*, ARS TECHNICA, June 21, 2015, http://arstechnica.com/security/2015/06/epic-fail-how-opm-hackers-tapped-the-mother-lode-of-espionage-data/.

[24] *See* Forms, *SF 86 2010* in Federal Investigation Forms, OPM, 1, https://www.opm.gov/forms/pdf_fill/sf86.pdf (last visited on Sept. 28, 2015).

breaches—are known to receive 10 million confirmed intrusion attempts in an average month.[25] The massive number of attempted intrusions into the OPM's network in an average month put the OPM on notice prior to the OPM Breach that hackers were heavily targeting its IT Software Systems.

### B.    The OIG Documents the OPM's Cyber-Security Failures

33.    FISMA legally obligates federal agencies—including the OPM—and their contractors to abide by certain cyber-security and IT Software System requirements. Specifically, the OPM and its director must "develop[] and oversee[] the implementation of policies, principles, standards, and guidelines on information security, including through ensuring timely agency adoption of and compliance with standards promulgated under section 11331 of title 40." 44 U.S.C. § 3553(a)(1); *see also id.* § 3554(a)(1)(B)(iii).

34.    FISMA also requires that federal agencies "develop, document, and implement an agency-wide information security program to provide information security for the information and information systems that support the operations and assets of the agency, including those provided or managed by another agency, contractor, or other source[.]" *Id.* § 3554(b). The agency-wide security program must include, *inter alia*: risk assessments of the harm from security breaches; policies and procedures in compliance with Section 11331 of Title 40; personnel and contractor training; periodic testing; and evaluation of the effectiveness of information security policies. *See id.* In order to ensure that federal agencies abide by FISMA's requirements, FISMA has a comprehensive reporting scheme in which all agencies, including OPM, must participate.

---

[25] *See OPM Data Breach*: *Hearing before the H. Comm. On Oversight and Government Reform*, 114th Cong. (2015) (Prepared Statement of Katherine Archuleta, Director, U.S. Office of Personnel Management).

35.     Specifically, FISMA requires (1) annual agency-wide information security program self-reviews; (2) annual Inspector General evaluations; (3) agency reporting of the results of Inspector General evaluations for unclassified IT Software Systems to the Office of Management and Budget ("OMB"); and (4) an annual OMB report to Congress summarizing the material received from agencies. *See id.* § 3554(c); § 3555.

36.     One of the most comprehensive reviews the OPM undergoes is the OIG's annual audit during which the OIG—relying on standards promulgated under 40 U.S.C. § 11331— independently audits the OPM to ensure that its agency-wide information security program complies with all FISMA requirements. In the course of its audit, the OIG reviews the status of the following measures the OPM is required to implement in its agency-wide information security program: (1) Security Assessment and Authorization (the process of certifying an IT Software System's security controls and authorizing the system for use); (2) Risk Management (risk management policies and procedures); (3) Configuration Management (controls in place to manage the technical configurations of the OPM's servers, databases, and workstations); (4) Incident Response and Reporting Programs (the procedures and requirements for reporting cyber-security incidents); (5) Security Training Program (whether employees are trained in cyber-security awareness pursuant to FISMA); (6) Plans of Action and Milestones ("POA&M") Program (the use of POA&M, a tool used to assist agencies in identifying, assessing, prioritizing, and monitoring the progress of corrective efforts for cyber-security weaknesses); (7) Remote Access Program (the policies and procedures related to authorization, monitoring, and controlling all methods of accessing the agency's network from a remote location); (8) Identity and Access Management (the policies and procedures for creating and removing user accounts, and managing user account security); (9) Continuous Monitoring Program (the efforts to

continuously monitor the cyber-security state of its IT Software Systems); (10) Contingency Planning Program (the contingency plan for potential cyber-security complications); (11) Contractor Systems (the method used to maintain oversight of contractor IT Software Systems); and (12) Security Capital Planning (the planning process to determine resources required to protect IT Software Systems).[26]

37.     In addition to the above requirements, the OIG also audits the OPM's Security Governance Structure—the overall framework and supporting management structure and processes that are the foundation of a successful agency-wide information security program.  The OIG added this category after repeated audits demonstrated that the each of the OPM's IT Software System departments had its own Designated Security Official ("DSO") responsible for testing and maintaining the cyber-security of their respective IT Software Systems.

38.     As early as the 2009 audit report, the OIG recognized that the OPM's decentralized system for cyber-security maintenance resulted in departments with differing levels of FISMA compliance.  The OIG found that because there was not a single team to oversee and coordinate cyber-security efforts, there was no uniformity in the OPM's cyber-security practices, and that the OPM had *no reliable procedure for ensuring that proper cyber-security measures were in place* in the departments' IT Software Systems.  Furthermore, the OPM's DSOs were not certified cyber-security professionals, and, instead, performed cyber-security duties in addition to their fulltime responsibilities.

39.     In 2012, the OPM developed the Office of the Chief Information Officer ("OCIO") purportedly to combat the decentralization of the OPM's Security Governance Structure.  The OCIO was tasked with overseeing and centralizing the work of the DSOs.

---

[26] *See supra* at 5, note 6, FY 2014 Audit at 2.

However, by 2014, the OPM had only partially implemented the centralization and the OIG's FY 2014 Audit showed that many of the OPM's IT Software Systems remained decentralized despite the development of the OCIO.   According to the FY 2014 Audit, the "OPM's decentralized governance structure continues to result in many instances of non-compliance with FISMA requirements."[27]   The chart below illustrates that, as of FY 2014, the OIG determined that numerous OPM systems continued to remain noncompliant with FISMA requirements.[28]



40.     The OIG's FY 2014 audit highlighted a number of FISMA security measures that the OPM failed to comply with, including that, *inter alia*:

---

[27] *Id.* at 6.

[28] *Id.*

- the OPM lacked acceptable risk management policies and procedures, and specifically failed to assess risk, maintain a risk registry, or communicate agency wide risks to its departments;

- the OPM failed to have appropriate configuration controls in place, specifically lacking a "mature vulnerability scanning program" to find and track the status of cyber-security weaknesses in its IT Software Systems;

- the OPM's automated cyber-security alert system reported a high rate of false security alerts that could delay the identification and response to actual security breaches;

- the OPM failed to effectively use POA&M, accordingly, the OPM could not effectively identify and monitor the progress of the corrective efforts and ensure that those weaknesses were fixed;

- the OIG found that where employees accessed the OPM's system from a remote location, the remote access sessions did not terminate or lock out after the period of inactivity required by FISMA;

- the OPM failed to continuously monitor the cyber-security controls of all of its IT Software Systems, finding that only 37 of 47 systems were adequately tested for cyber-security issues in 2014, and that it had been "over eight years since all systems were subject to an adequate security controls test"; and

- the OPM failed to maintain and test contingency plans for every software system as required under the OPM's policies—it only maintained contingency plans for 4l of 47 IT Software Systems, and only tested 39 of 47 IT Software Systems.

41.    Moreover, the OMB had previously promulgated Memorandum M-11-11 which required that all federal IT Software Systems be upgraded to use PIV credentials for multi-factor

authentication by the fiscal year of 2012. A PIV card, shown below, is a government identification card which contains a computerized chip to add an extra layer of security to database access to ensure that only authorized users access the system. The card can be used in conjunction with a user's Personal Identification Number (PIN) to verify the user's identity before permitting access to the government software system.



42. Use of a PIV card allows multi-factor authentication—an added level of security and barrier to cyber-attacks—that requires a user to, for example, enter a password and then swipe a PIV card to access a computer terminal or IT Software System. If a multi-factor authentication system is in place, hackers who have the passwords of the IT Software System cannot breach the system because they would need the PIV card as well, which would be in the rightful user's possession. The OIG's 2014 audit revealed that *none* of the OPM's major IT Software Systems required PIV credentials for multi-factor authentication.

43. Lastly, the OIG's 2014 audit revealed that only 10 of 21 IT Software Systems due for Security Assessment and Authorization were completed on time. FISMA, the OMB, and NIST guidelines require all major IT Software Systems to undergo reauthorization every three

years, or in the alternative, to be continuously monitored for Authorization.  To have a valid Authorization, the IT Software System must comply with all FISMA, OMB, and NIST security requirements.  DSOs are supposed to evaluate whether each major IT Software System complies with all relevant security requirements and then approve the software for operation if it does comply, or alternatively, prohibit its operation if it does not.  Even though 11 of 21 of the OPM's major IT Software Systems did not have a valid Authorization, and, thus, were not legally allowed to operate, the OPM did not shut down the unauthorized IT Software Systems.

44.     According to the OIG, the unauthorized IT Software Systems "were among the most critical and sensitive applications owned by the agency."  It warned that over 65 percent of OPM software systems reside in two support systems lacking authorization and subject to security risks.  In addition, two unauthorized systems were owned by the Federal Investigative Services department, for which the OIG recognized, "[a]ny weaknesses in the information systems supporting this program office could potentially have national security implications."  In response to the critical flaws in the OPM's systems and in order to prevent dire national security implications, the OIG recommended that the OPM shut down all unauthorized major IT Software Systems.  However, the OPM refused to follow the OIG's recommendation and continued to operate all unauthorized systems.

### C.     The OIG's Annual Audits Reveal the OPM's Repeated Failure to Comply with FISMA

45.     The material weaknesses in the OIG's 2014 audit report were not isolated instances, but were part of the OPM's long history—since at least 2007—of deficient security measures in its IT Software Systems.

46.     In every audit report between 2009 and 2014, the OIG found material weaknesses and deficiencies.  In 2009, the OIG found, *inter alia*: that the OPM's failure to have adequate

leadership, policies, and guidance to implement necessary security measures constituted a material weakness. Specifically, the OPM was without a permanent senior agency information security official for 18 months. Also, one of the major IT Software Systems was not Authorized and thus should not have been allowed to operate. That same year, the OIG started to evaluate the adequacy of the OPM's overall cyber-security governance program.

47.     In 2010, the OIG found material weaknesses and noted that the OPM's cyber-security measures were actually worse than previous years. First, the OIG found a material weakness in the OPM's cyber-security governance program stemming from its security management structure, insufficient staff, and lack of policies and procedures. The OIG also determined that the OPM's Security Assessment and Authorization[29] process was a material weakness, noting that the quality of the authorization process had decreased from the previous two years because the OPM staffed the DSO positions in a decentralized manner requiring the DSOs to report to the department offices that operate major IT Software Systems, instead of a central security office. Furthermore, the OIG noted that very few of the DSOs had any background in information security.

48.     In 2011, the OIG again determined that the OPM's information security governance process represented a material weakness. The OIG reported that the OPM's decentralized structure made it questionable whether the DSOs had the skills and resources necessary to implement security policies and procedures. Significant deficiencies still remained in the OPM's Authorization process because of the range in quality of the Authorization process completed by different DSOs.

---

[29] In the 2010 audit report, the OIG labeled this process the "Certification and Accreditation" process.

49.     In 2012, the OPM's cyber-security governance structure remained a material weakness because the OPM did not fill a key leadership position until the very end of fiscal year 2012.  This same year, the OPM suffered "numerous security incidents [] that led to the loss or unauthorized release of mission-critical or sensitive data."  One such security incident involved an unknown hacker who broke into the OPM database, stole thirty-seven IDs and passwords, and then posted them online.

50.     Continuing the trend, in 2013, the OIG concluded that "little progress was made" and again determined that the OPM's decentralized governance structure remained a material weakness because only 17 of the OPM's 47 IT Software Systems were maintained by professional Information System Security Officers.  The OIG expressed its doubt about the OPM's ability to manage major software systems and specifically blamed the OPM's decentralized governance structure for its failure to comply with numerous FISMA requirements. The OIG also noted that *none* of the OPM's 47 major applications required the second layer of security of PIV authentication—meaning that a hacker could access the system with an employee's password alone.

51.     Finally, in 2014, the OIG determined that the OPM's refusal to comply with FISMA was intentional and the result of no clear consequences for the agency or its Director if it failed to implement the required FISMA regulations.  Based on this finding, the OIG recommended an administrative sanctions system be put in place to fight instances of willful non-compliance with FISMA requirements.  Furthermore, the OIG recommended "that the performance standards of all OPM major system owners be modified to include a requirement related to FISMA compliance for the systems they own."

52.     When discussing the 2014 audit and subsequent OPM Breach before Congress, Michael Esser, the OIG assistant inspector general for audits, testified that: "We believe [OPM's] long history of systemic failures to properly manage its IT infrastructure may have ultimately led to the breaches we are discussing today."  He further testified that certain of the OPM's "weaknesses were identified as far back as Fiscal Year 2007."

### D.     Cyber-Security Attacks Prior to the OPM Breach

53.     Since at least 2007, OIG's reports put the OPM on notice of the material weaknesses in its agency-wide information security program.  Moreover, multiple cyber-security attacks and data breaches that occurred prior to the OPM Breach should have prompted the OPM to adopt the necessary security measures recommended in the OIG's annual audit reports.

54.     Prior to the OPM Breach, the OPM and two of its major contractors—USIS and KeyPoint—suffered cyber-security attacks that resulted in the theft of sensitive data.  The first incident occurred in November 2013 when hackers breached the OPM's IT Software Systems and stole manuals relating to network assets and information about the internal infrastructure. Then, in July 2014, *The New York Times* published an article reporting that hackers had infiltrated the OPM's network and targeted the records of thousands of federal employees undergoing security clearance investigations.[30]   Sometime in March 2014, hackers accessed several OPM IT Software System databases before federal authorities detected the intrusion and shut down the hack.

55.     A few months later, in August 2014, federal government officials revealed that USIS—a contractor that provided the bulk of background clearance checks for federal security clearances—had suffered a major cyber-security attack which lasted for over a year prior to its

---

[30] Michael S. Schmidt, David E. Sanger and Nicole Perlroth, Chinese Hackers Pursue Key Data on U.S. Workers, *The New York Times*, July 9, 2014, available at http://www.nytimes.com/2014/07/10/world/asia/chinese-hackers-pursue-key-data-on-us-workers.html?_r=0

discovery.[31]   The USIS breach was thought to have exposed thousands of federal employee records.   USIS was a major contractor of the OPM prior to that breach, and the OPM's Chief Information Officer admitted to Congress that both USIS and the OPM were attacked in March 2014 but claimed that the OPM "recognize[d] the problem" and partnered with DHS "to be able to put mitigations in place to better protect the information."   Shortly after the breach, the OPM did not renew its contract with USIS.

56.   After the USIS data breach, KeyPoint became the largest federal government contractor for performing private employee security clearances, including for the OPM. KeyPoint was suddenly responsible for USIS's entire case load, which averaged 21,000 background investigations a month.   In a short time span, KeyPoint doubled the size of its investigative workforce.   In this transition period for KeyPoint and the OPM, due care was of the outmost importance as KeyPoint's fast growth and the significant new case load was a perfect recipe for a break-down in the integrity of the system access credentials, and opportunity for hackers to slip into KeyPoint's network.   During this time, KeyPoint failed to establish the appropriate cyber-security measures required to protect Plaintiff's and Class members' PII and other sensitive data.

57.   In fact, in late October 2014, The Department of Homeland Security ("DHS") suspended all background investigations on Customs and Border Protection employees due to serious cyber-security concerns in DHS's background investigation contractors, including KeyPoint.   The DHS suspended background investigations because KeyPoint's cyber-security procedures could not meet DHS's "requirement for increased security standards for background

---

[31] Ellen Nakashima, DHS contractor suffers major computer breach, officials say, *The Washington Post*, Aug. 6, 2014, available at https://www.washingtonpost.com/world/national-security/dhs-contractor-suffers-major-computer-breach-officials-say/2014/08/06/8ed131b4-1d89-11e4-ae54-0cfe1f974f8a_story.html

investigation contractors accessing Personally Identifiable Information (PII)."[32]   The OPM, however, continued to use KeyPoint.

58.     In December 2014, the OPM announced that KeyPoint had been hacked and that the records of more than 48,000 federal employees had been compromised—a breach which may have lasted for 10 months.  The OPM denied that any evidence existed to conclude the OPM's own IT Software Systems had been compromised in the KeyPoint hack.  An OPM spokesperson, Nathaly Arriola, stated that "[w]hile there was no conclusive evidence to confirm sensitive information was removed from the system," the OPM would "out of an abundance of caution" notify 48,439 individuals whose data may have been breached.

59.     The KeyPoint data breach and information that followed showed that KeyPoint and the OPM grossly mishandled KeyPoint's transition period and, in the process, failed to protect Plaintiff's and Class members' records from cyber-security attacks.   For example, KeyPoint was unable to analyze the cyber-security attack announced in December 2014 because it failed to maintain "logs" of malware that was deployed to attack its systems.  Furthermore, in a Senate committee hearing on the OPM breach, KeyPoint's CEO Eric Hess admitted that the OPM credentials of a KeyPoint employee were compromised and used to gain access to the OPM's IT Software Systems in the OPM Breach.

60.     The OPM failed to ensure that KeyPoint established appropriate cyber-security measures to protect the Affected Individuals' data both before and after the KeyPoint hack and failed to discontinue its use of KeyPoint as a contractor after the KeyPoint hack.

---

[32] Jeryl Bier, *Customs and Border Protection Halts Background Checks Over Security Concerns*, THE WEEKLY STANDARD, Oct. 30, 2014, http://www.weeklystandard.com/blogs/customs-and-border-protection-halts-background-checks-over-security-concerns_817719.html.

61.     In an e-mail to OPM colleagues, Donna Seymour stated that following the KeyPoint data breach, "KeyPoint implemented numerous controls to strengthen the security of its network . . . which allowed [OPM] to continue to conduct business with the company without interruption" and that the "security of our network and the data entrusted to us remains our top priority [and the] incident serves as yet another reminder that we all must be ever-vigilant in our efforts to understand, anticipate and guard against the threat of cyber-attacks."  However, at the same time, the OPM remained noncompliant with FISMA requirements.

### E.     The OPM Breach

62.     On June 4, 2015, the OPM announced that its IT Software Systems had been breached and the agency would send notifications to approximately 4 million individuals whose PII may have been compromised.  The OPM issued a press release disclosing that the agency first noticed the intrusion in April of 2015, months before it made the actual announcement to those affected.

63.     A month later, on July 9, 2015, the OPM issued another press release announcing that a separate but related cybersecurity incident had occurred and that the data of 21.5 million individuals may have been breached.  Specifically, the OPM announced that highly sensitive information, including the Social Security Numbers ("SSNs") of 21.5 million individuals, was stolen from the background investigation databases.  This breach included PII for 19.7 million individuals that applied for a background investigation, and 1.8 million non-applicants, predominantly spouses or co-habitants of applicants.  The OPM announced that the stolen records also included findings from interviews conducted by background investigators and approximately 1.1 million fingerprints. Any individual who underwent a background investigation through the OPM in 2000 or afterwards was likely impacted by the OPM Breach.

On September 23, 2015, the OPM increased its estimate of 1.1 million stolen fingerprints to 5.6 million.

64.     The OPM's July 9, 2015 press release confirmed that the compromised records included "identification details such as Social Security Numbers; residency and educational history; employment history; information about immediate family and other personal and business acquaintances; health, criminal and financial history; and other details."  Usernames and passwords that background investigation applicants used to fill out their background investigation forms were also stolen.  The OPM has offered certain Affected Individuals limited credit monitoring, identify theft insurance, and related services.  Specifically, all Applicants who have had their background investigation information stolen (and their spouses and co-habitants) will receive three years of (1) full service identity restoration support and victim recovery assistance; (2) identity theft insurance; (3) identity monitoring for minor children; (4) continuous credit monitoring; and (5) fraud monitoring services beyond credit files.  Affected Individuals who had PII compromised in the first OPM breach were offered 18 months of credit monitoring services and identity theft insurance.

65.     The OPM's history of material weaknesses in its IT Security Systems and the facts surrounding the OPM breach demonstrate the agency's responsibility for the hackers' ability to steal the PII and other sensitive information of 21.5 million individuals by compromising the eOPF system and EPIC's database.

66.     In a July 2015 report, the Institute for Critical Infrastructure Technology ("ICIT")—a respected institute focused on the issue of cyber-security—asserted that the OPM's hackers likely accessed the OPM's IT Software Systems through valid user credentials.  All the hackers needed was one level of valid user credentials to enter the OPM's systems.  Once inside,

hackers could then create higher-level credentials to facilitate lateral movement across systems. Having privileged entry into the OPM's systems likely allowed the hackers to go undetected for long periods of time.  The ICIT noted that the valid credentials could have been obtained through email phishing campaigns, careless practices, the 2013 OPM breach, the USIS breach, or the 2014 KeyPoint breach.  Directly criticizing the OPM's lack of adequate cyber-security measures, the ICIT stated "[g]iven the lack of sophistication of the attack, the shabby defenses of the OPM's critical systems, and the immense value of the exfiltrated assets, almost any known actor group would have seized the opportunity to breach the OPM if they had the knowledge of their internal systems and the resources to conduct the breach."  According to ICIT, "the OPM breach was not a sophisticated attack."

67.    Industry analysts and Congressional leaders have criticized the OPM for the relative ease with which the hackers apparently accessed the OPM's IT Software Systems. Covenant Security Systems Founder Danyetta Fleming Magana remarked "it appears as though this was the equivalent of a car thief politely asking for the car keys and once handed them drove the car for over a year before being noticed."  Moreover, House Representative Steve Russell stated that the OPM's cyber-security failures were "absolute negligence that puts the lives of Americans at risk."

68.    Cyber-security analysts all agree on one thing: the OPM's failure to adopt common security measures, such as those recommended by the OIG and mandated by federal law, directly led to the massive scope of the OPM Breach.  Critically, the OPM's decision to continue operating unauthorized IT Software Systems in the Human Resources Solutions and Federal Investigative departments—the two departments that respectively housed the eOPF and EPIC systems—directly contributed to the enormity of the breach.  Further, OPM's decision to

continue using KeyPoint after it was breached and failure to require KeyPoint to establish appropriate cyber-security safeguards also contributed to the OPM Breach.

### F.    The Ramifications of the OPM Breach

69.    On July 10, 2015, one day after the OPM announced that 21.5 million individuals had their personal data compromised, Director Archuleta resigned as head of the OPM.  In her wake, she left millions of Affected Individuals fearing for the safety of their identities, bank accounts, credit scores, and lives.  As a result of Defendants' conduct and the OPM Breach, Plaintiff and the Class lost control over the value of their PII and data, and will be subject to an ongoing substantial risk of identity theft and other harms in perpetuity.  Many of the Affected Individuals made their concerns known to their Congressional representatives who in turn reported those concerns to Director Archuleta at Congressional hearings.

70.    The OPM continues to actively disclaim liability. In a letter sent to certain Affected Individuals, the OPM offered 18 months of credit monitoring services but stated that the "services are offered as a convenience" and "nothing in this letter should be construed as [the] OPM or the U.S. Government accepting liability."

71.    In a Senate Committee on Homeland Security and Governmental Affairs hearing on the OPM Breach, Senator Kelly Ayotte expressed deep concern that the OPM's strategy for managing the compromise of personnel records was "insufficient" and that it could lead to "potentially millions of individuals who now find themselves to be victims of tax fraud as well."

72.    In a House Committee on Oversight and Government Reform hearing on the OPM Breach, Delegate Eleanor Holmes Norton voiced her concern regarding the limited amount of credit monitoring services the OPM has offered the Affected Individuals.  Many of her constituents had expressed fear of what would happen once the OPM's 18 months of credit

monitoring expired.  Delegate Norton stated that "18 months may be too short a period of time, given how much you don't know and we don't know."

73.    In that same hearing, Representative William Hurd opined that the consequences of the data breach could lead to financial trouble and even physical danger for those whose data was compromised.  Representative Hurd stated that "[i]f it was the Russians, all this information is going to be sold and then used . . . to drain people's bank accounts, use this to create new access codes to get into private information.  If it was narcotraficantes in Mexico, which have the capability of . . . doing cyber-attacks, it's the home addresses of men and women in Border Patrol, people that are keeping us safe, all right?"

74.    At the Senate Committee on Appropriations Subcommittee on Financial Services and General Government hearing on the OPM Breach, Senator John Boozman astutely noted, "[w]hat has happened at OPM is devastating.  Millions of Americans and their families and friends have been affected. Giving those impacted limited free credit monitoring and identity theft insurance will not be enough to address the long-term consequences that we may see for years to come."

75.    The concerns highlighted above have been echoed by federal agencies and industry analysts.  In testimony before the Subcommittee on Information Policy, Census and National Archives Committee on Oversight and Government Reform: Identity Theft, Daniel Bertoni, Director of the United States Government Accountability Office ("GAO") stated that, many victims of identity theft "face substantial costs and inconvenience repairing damage to their credit records . . . and [s]ome individuals have lost job opportunities, been refused loans, or even been arrested for crimes they did not commit as a result of identity theft."  Bertoni stated that, "in [one] year, as many as 10 million people—or 4.6 percent of the U.S. adult population,

discover that they are victims of some form of identity theft, translating into reported losses exceeding $50 billion."

76.      In an article published in *The Washington Post*, Ed Mierzwinski, Federal Consumer Program Director, stated that information contained in federal job applications can be used for identity theft to set up fraudulent lines of credit.  Mierzwinski recommended that federal applicants tell credit monitoring agencies to stop any new lines of credit from being opened in their name.  To do that, a federal applicant would be required to contact all three of the major credit monitoring agencies and pay a fee-between $10 and $l5 per agency to freeze and unfreeze each time they want to open a line of credit.  Mierzwinski stated that monitoring services, like the one OPM is providing, create a false sense of security because if data is sold off, it could be years before the data is used.

77.      Hackers have already taken advantage of the information gained in the OPM breach by attempting to trick people into revealing passwords or otherwise sensitive information, and by offering PII for sale.  After the OPM Breach, the OPM contacted certain Affected Individuals by email to offer them a limited credit and identity protection plan.  Those emails were quickly duplicated by hackers and used to send phishing e-mails in an attempt to gain additional confidential information.  Both sets of emails contained a link for Affected Individuals to provide confidential information to register for the OPM's credit monitoring services.  Chris Roberts, founder of OneWorldLabs—a search engine that checks the darknet daily for data that could compromise security—has stated that "[t]he recent OPM breach was identified, noted and the credentials and identities have been discovered online and are being traded actively." Moreover, according to *The Wall Street Journal*, certain websites are reporting that the hacked

Social Security Numbers have been offered for sale on "a popular black market" that is part of the "dark web."

## V.     PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

78.     Plaintiff and millions of Class members have been seriously harmed by the OPM's uniform mishandling of their PII and/or personal and sensitive data.   Detailed information about all aspects of Plaintiff's and Class members' lives has been stolen and is now in the hands of criminals to be bought, sold, or otherwise distributed for the purpose of misappropriating Plaintiff's and Class members' identities or property.   Only through aggressive and comprehensive identity theft solutions can the security of Plaintiff's and Class members' identity be maintained in the wake of the OPM Breach, if at all.

79.     Plaintiff and Class members have suffered and will continue to suffer damages, including actual damages within the meaning of the Privacy Act, pecuniary losses, anxiety, and emotional distress.   Plaintiff and the Class have already expended time and resources by responding to the OPM Breach caused by Defendants.   Plaintiff and Class members have already suffered, will continue to suffer, and/or have an increased risk of suffering from:

- out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of financial and medical accounts;

- current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the OPM Breach for the remainder of Class members lives;

- the loss of the opportunity to control how their PII is used;

- the diminution in the value and/or use of their PII entrusted to the OPM for the purpose of deriving employment from the OPM;

- the compromise, publication, and/or theft of their PII;

- lost opportunity costs associated with effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the OPM Breach, including, *inter alia*, efforts spent researching how to prevent, detect, contest, and recover from identity and health care/medical data misuse;

- costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including complete credit denial and/or increased costs to use credit, credit scores, credit reports, and assets;

- unauthorized use of compromised PII to open new financial and/or health care or medical accounts;

- the continued risk to their PII, which remains in the OPM's possession and is subject to further breaches so long as the OPM fails to undertake appropriate and adequate measures to protect the PII in its possession; and

- continued risk associated with government-issued identification, including, *inter alia*, Social Security numbers, passports, naturalization numbers, military service numbers, and visas.

80.    The OPM's proffered remedies are woefully inadequate to protect against or compensate victims for the above risks for at least four reasons.

81.    First, the particular credit monitoring services being offered to victims do not provide comprehensive protection.  While the services offer a limited version of traditional credit monitoring, they do not offer the more robust features of a premium three-bureau, modern identity service, which is necessary in this instance due to the breadth of the information compromised in the OPM Breach.

82.     However, even traditional credit monitoring at its best is only effective for a relatively small portion of the identity and reputational crimes these particular victims can be subjected to, due to the expansive data involved in the breach.  A report by all three major credit reporting agencies will generally catch new credit account fraud in traditional areas.  But criminals can still actively sell the victims' data to underworld sites for tax identity theft, medical identity theft, and other difficult to detect forms of identity crime such as synthetic identity theft, identity theft of medical information or insurance information, or theft of professional credentials.  Thieves also frequently target breach victims with malware, phishing attacks, and "key-logger" attacks.  Thieves frequently use mobile payment and social media sites and newer forms of credit payment like Amazon and EBay for committing fraud.  Any credit monitoring service offered to victims of this extensive breach needs to offer more, not less protection, including software and other technical support to detect malware and other malicious attacks targeting Affected Individuals.  For all these reasons, credit monitoring alone is insufficient to repair the damage done by the OPM Breach.

83.     Second, the proposed remedies do nothing to address the significant risk of reputational harm victims are exposed to in online media.  Modern remediation of severe breaches includes monitoring for reputational mentions across tens of thousands of social media and other web sites to ensure breach victims are not being impersonated in social media websites and elsewhere online.  This is an important safety precaution for those individuals who have had their information breached, particularly those with high security clearances or who work in sensitive positions.

84.     Third, the proposed remedies do not appear to include comprehensive monitoring for criminal data sales on the dark web sites and data broker sites that deal in stolen data.  This is

a necessary service that is offered for victims of identity theft and data breaches, particularly where the data stolen is as sensitive as it was in the OPM Breach.

85.     Finally, both the 18-month duration of services currently offered by the OPM for personnel breach victims and the three years of services for the background investigation breach victims are far too short.  It is well-documented by law enforcement professionals and identity theft experts that hackers "season" data by allowing it to age for 5 years or more.  The more sensitive and potentially valuable the data is, the more it can be seasoned by criminals.  Highly sensitive investigative background check data, which is inclusive of unique and often non-changeable data such as permanent medical conditions and the full battery of information about relatives, warrants an extended and in some cases lifetime of protection due to the completeness of the data and its high value on the black market.

86.     Plaintiff and the Class have and will continue to reasonably incur expenses to avoid or mitigate the harm caused by the OPM Breach.  Thus, Plaintiff and the Class already have suffered damages as a result of Defendants' conduct and will continue to suffer damages throughout their lifetimes.  The nature of the PII and data stolen in the OPM Breach is so confidential and sensitive that it can be used to replicate identities and inflict harm on Plaintiff and the Class in perpetuity.  Accordingly, there is an ongoing substantial risk of harm to the Affected Individuals that will require Plaintiff and the Class to monitor, among other things, their financial accounts and credit reporting for a lifetime.  This significant expenditure of time and resources by Plaintiff and Class to protect themselves from identify theft and other harms is a result of Defendants' conduct and the OPM Breach, and would not have occurred but for Defendants' conduct.

## VI.    CLASS ACTION ALLEGATIONS

87.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class: All persons whose PII and/or personal or sensitive data was compromised as a result of the data breaches announced by the OPM on or about June 4, 2015 and July 9, 2015.

88.    Excluded from the proposed Class are the OPM, as well as its agents, officers, and directors, and their families.  Also excluded from the Class are KeyPoint, and its agents, officers, and directors, and their families, as well as its parent companies, subsidiaries, and affiliates.  Any judicial officer assigned to this case is also excluded.  Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information.

89.    This action is brought and may be properly maintained as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(1), 23(b)(2) and/or 23(b)(3).

90.    The Class is so numerous that joinder of all members is impracticable.  Plaintiff believes that there are at least 21 million proposed Class members throughout the United States.

91.    Common questions of law and fact exist as to all members of the Class and predominate over any issues solely affecting individual members of the Class.  The common questions of law and fact include but are not limited to:

a.   whether the OPM's conduct violated the Privacy Act of 1974;

b.   whether the OPM failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of the records in its system of records;

c.   whether the OPM failed to protect against any known and anticipated threats or hazards to the security and integrity of Plaintiff's and Class members' records in the OPM's system of records;

d.   whether the OPM disclosed by any means of communication Plaintiff's and Class members' records without their prior written consent;

e.   whether the OPM's conduct was willful or with flagrant disregard for the security and confidentiality of Plaintiff's and Class members' PII and records;

f.   whether the OPM's conduct violated the Administrative Procedure Act;

g.   whether the OPM failed to ensure that its major contractors, including USIS and KeyPoint, established the appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class members' records;

h.   whether KeyPoint failed to act reasonably in securing Plaintiff's and Class members' records;

i.   whether KeyPoint's conduct was negligent;

j.   whether Defendants breached their legal duties by failing to protect Plaintiff's and Class members' records; and

k.   whether Plaintiff and Class members are entitled to damages, declaratory, and/or injunctive relief.

92.   Plaintiff's claims are typical of the claims of the Class.   As alleged herein, Plaintiff and the Class all sustained damages arising out of the same course of unlawful conduct by Defendants.

93.   Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto.   Plaintiff will fairly and adequately protect the interests of the Class and have no interests adverse to, or which conflict with, the interests of the other members of the Class.

94.     Plaintiff's interests are co-extensive with, and not antagonistic to, those of the absent Class members.  Plaintiff will undertake to represent and protect the interests of the absent Class members.

95.     Plaintiff has engaged the services of the undersigned counsel.  Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and the absent Class members.

96.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

97.     Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

98.     The Class may also be certified under Rule 23(b)(1)(A) and (B) because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, would be dispositive of the interests of nonparties to the individual adjudications, and would substantially impair the ability of such nonparties to protect their interests.

99.     The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

100.    The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical.  The Class has a high degree of similarity and is cohesive.  Prosecution of the action through multiple representatives would be objectionable and Plaintiff anticipates no difficulty in the management of this matter as a class action.

## VII.    CLAIMS

**FIRST CLAIM**
**VIOLATIONS OF THE PRIVACY ACT OF 1974 (5 U.S.C. § 552a)**
**("PRIVACY ACT")**
**On behalf of Plaintiff and Class members against OPM**

101.    Plaintiff incorporates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

102.    The OPM is an "agency" within the meaning of the Privacy Act, as defined in 5 U.S.C. § 552(e).

103.    Pursuant to 5 U.S.C. § 552a(b), agencies are prohibited from disclosing "any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ."

104.    Under 5 U.S.C. § 552a(e)(10), "[e]ach agency that maintains a system of records shall . . . establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained."

105.    Under 5 U.S.C. § 552a(m)(1), "[w]hen an agency provides by a contract for the operation by or on behalf of the agency of a system of records to accomplish an agency function,

the agency shall, consistent with its authority, cause the requirements of this section to be applied to such system."

106.    During the recruiting, security check and/or other processes, the OPM obtained the PII, SF-86 data, and other sensitive information, of Plaintiff and Class members and preserved that data in a system of records—the IT Software Systems.

107.    The OPM is, and at all relevant times was, required by law to comply with FISMA, and is responsible for ensuring that its cyber-security systems comply with 5 U.S.C. § 552a and other rules and regulations governing cyber-security practices.

108.    Specifically, under 5 U.S.C. § 552a, the OPM is prohibited from disclosing Plaintiff's and Class members' PII and other personal and/or sensitive data, and is required to establish appropriate safeguards to insure the security and confidentiality of records and to protect against any anticipated threats to their security.

109.    Despite these obligations, the OPM—through a continued course of systematic conduct—willfully, intentionally, and with flagrant disregard for the Affected Individuals' rights under the Privacy Act, failed to comply with FISMA, failed to implement OIG recommendations, and refused to take steps to implement "appropriate safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity." 5 U.S.C. § 552a(e)(10).

110.    Since at least 2007, the OIG's annual audit reports have consistently recognized the OPM's non-compliance with FISMA and have identified multiple "material weaknesses" in OPM's cyber-security practices. OPM's intentional and willful failure to comply with FISMA and the Privacy Act resulted in multiple material weaknesses in the cyber-security of its IT Software Systems and left Plaintiff and Class members vulnerable to theft of their PII and other

sensitive information.  Throughout this time period, OIG informed OPM that "[t]he continuing weaknesses in OPM's information security program result directly from inadequate governance," insufficient staff, "a lack of policy and procedure, and the decentralized DSO model in place at OPM."

111.    OPM was put on notice and knew that its practices were not in compliance with 5 U.S.C. § 552a, FISMA, and other rules and regulations governing cyber-security practices because OIG's annual audit reports explicitly identified how the OPM's cyber-security practices violated federal law and offered recommendations for OPM to strengthen its cyber-security and become compliant with federal regulations, which OPM chose not to implement.

112.    Between 2007 and 2014, the OIG also found that the OPM was not in compliance with several standards promulgated under 40 U.S.C. § 11331, as is required by FISMA, including in the areas of risk management, configuration management, incident response and reporting, continuous monitoring management, contractor systems, security capital planning, and contingency planning.

113.    Despite these warnings, the OPM failed to take several steps required to remedy its cyber-security weaknesses, including failing to: (1) implement the PIV multi-factor authentication for all 47 major OPM applications as required by OMB Memorandum M-11-11; (2) centralize its cyber-security structure and adequately staff it with DSOs properly trained in cyber-security to effectively manage its security program and protect against a breach; and (3) shut down unauthorized IT Software Systems, and ensure all operating systems were authorized, as recommended by OIG.

114.    OPM's systematic and continued failure to comply with FISMA, the Privacy Act and other rules and regulations and its decision not to follow the OIG's 2014 recommendation to

shut down IT Software Systems that did not have current and valid authorizations resulted in (1) the disclosure of Plaintiff and Class members' records without prior written consent in violation of 5 U.S.C. § 552a(b) and (2) the "substantial harm, embarrassment, inconvenience, or unfairness" to Plaintiff and Class members, that 5 § U.S.C. 552a(e)(10) is designed to protect against.

115.    The OIG found that one of the "core causes" of the OPM's non-compliance with FISMA was the "fact that there are currently no consequences for OPM systems that do not have a valid Authorization to operate."

116.    Further,  under  5 U.S.C. § 552a(m)(1), the OPM was responsible for ensuring that its contractors, including USIS and KeyPoint, established appropriate safeguards to insure the security and confidentiality of records of Plaintiff's and Class members' data.  The OPM failed to ensure that its contractors established cyber-security systems to appropriately safeguard the Affected Individuals' PII and sensitive data, and failed to discontinue its use of KeyPoint as a contractor after the KeyPoint breach or require that KeyPoint remedy its cyber-security deficiencies.

117.    As a result of the OPM's conduct, Plaintiff and Class members have suffered and will continue to suffer actual damages and pecuniary losses within the meaning of the Privacy Act.  Such damages have included or may include without limitation (1) the loss of the opportunity to control how their PII and data is used; (2) the diminution in the value and/or use of their PII and data entrusted to the OPM for the purpose of deriving employment from the OPM and with the understanding that the OPM and its contractors would safeguard their PII and data against theft and not allow access and misuse of their PII and data by others; (3) the compromise, publication, and/or theft of their PII and the PII and data of their family members,

neighbors, and acquaintances; (4) out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of financial and/or medical accounts; (5) lost opportunity costs associated with effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the OPM Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity and health care medical data misuse; (6) costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including complete credit denial and/or increased costs to use credit, credit scores, credit reports and assets, and re-issuance fees for visas or other compromised credentials; (7) unauthorized use of compromised PII to open new financial and/or health care or medical accounts; (8) the continued risk to their PII and sensitive data, and the PII and data of their family members, neighbors, and acquaintances, which remains in the OPM's possession and is subject to further breaches so long as the OPM fails to undertake appropriate and adequate measures to protect the PII and data in its possession; (9) the continued risk associated with government-issued identification, including without limitation Social Security cards, passports, naturalization numbers, and military service numbers and (10) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII and data compromised as a result of the OPM Breach for the remainder of the lives of Plaintiff, the Class members and their families.  Plaintiff and Class members are thus entitled to relief pursuant to 5 U.S.C. §§ 552a(g)(1)(D) and (g)(4).

**SECOND CLAIM**
**VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 701,**
*et seq.)*
**On behalf of Plaintiff and Class members against OPM**

118.    Plaintiff incorporates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

119.    Pursuant to the Administrative Act, any person suffering a legal wrong because of an agency action or any person that is adversely affected by an agency action, within the meaning of a relevant statute, can sue an agency in federal court.  *See* 5 U.S.C. § 701.

120.    As a federal government agency, the OPM is required (and has a continuing obligation) to comply with FISMA and implement rules and standards complying with 40 U.S.C. § 11331.  As alleged herein, from 2007 to 2014, through a continuous course of conduct, the OPM intentionally failed to comply with FISMA and 40 U.S.C. § 11331, resulting in violations of the Privacy Act, 5 U.S.C. §552a.

121.    The OPM's non-compliance with FISMA's requirements and other rules and regulations was consistent between 2007 and 2014 and was not a valid exercise of discretion. FISMA is binding law and pursuant to FISMA's terms, Director Archuleta was required to oversee the OPM's compliance with its standards.  The OIG found that Director Archuleta and the OPM failed to abide by FISMA's terms and that failure was caused in large part by the absence of any consequence for such non-compliance.  Ultimately, the OPM's non-compliance with FISMA resulted in the Privacy Act violations at the center of this lawsuit.

122.    The OPM's non-compliance with FISMA is well documented in each of the OIG's annual audit reports issued from 2009 to 2014.  As alleged above, the OIG instructed the OPM to bring its IT Software Systems in compliance with FISMA, but each year, the OPM made the decision not to do so.  For example, from 2011 to 2014, the OIG advised the OPM it was not in compliance with FISMA because of its decentralized cyber-security governance system.  Yet the OPM repeatedly made the decision not to centralize its system in order to comply with FISMA's requirements.   And in 2014, the OIG's audit specified: "OPM's decentralized

governance structure continues to result in many instances of non-compliance with FISMA requirements."

123.    The OPM's continual failure to comply with FISMA culminated in the OPM's choice not to follow the OIG's November 2014 recommendation to shut down several of its unauthorized software systems.  In the 2014 audit report, the OIG found 11 of 21 software systems were unauthorized, meaning that those software systems had not been checked to determine whether they were vulnerable to a data breach.  The OIG recommended that the OPM shut down "[software] systems that do not have a current and valid authorization."  However, the OPM refused to shut down its software systems.  At the Committee Hearing, Director Archuleta stated that, "[i]t was my decision that we would not [close down the software systems] but continue to develop the systems and ensure we have security on those systems."

124.    The OPM's many decisions not to comply with FISMA and OMB requirements including, *inter alia*, deciding not to: (1) implement a centralized cyber-security governance system; (2) use PIV authentication for all of its IT Software Systems; and (3) follow the OIG's recommendation and shut down its unauthorized IT Software Systems, constitute final agency actions.  The OPM's decisions were final agency actions because the decisions were the consummation of the OIG's decision making process, were not of a merely tentative or interlocutory nature, and denied Plaintiff and Class members the right to the protection of their PII and other personal and/or sensitive data.  Because the OPM's willful and intentional continuous course of conduct resulted in the OPM Breach in which Plaintiff's and Class members' PII was compromised, the OPM's continuous string of decisions not to comply with FISMA caused violations the Privacy Act and damaged Plaintiff and Class members.

125.     The OPM's decisions not to comply with FISMA, including its decisions not to implement a centralized cyber-security governance system and its refusal to shut down the OPM's unauthorized IT Software Systems in contravention of the OIG's instructions, were arbitrary, capricious, and otherwise not in accordance with law; was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and was without observance of procedure required by law.

126.     Because of the OPM's decisions not to comply with FISMA, the OPM violated the Privacy Act, Plaintiff and Class members suffered a legal wrong, and were adversely affected insofar as cyber attackers gained access to their sensitive, confidential, and personal information.

127.     Absent a claim under the Administrative Procedure Act, Plaintiff and Class members do not have an adequate remedy at law to seek injunctive and declaratory relief against the OPM.

128.     Plaintiff and Class members are thus entitled to declaratory and injunctive relief.

### THIRD CLAIM
### NEGLIGENCE
### On behalf of Plaintiff and Class members against KeyPoint

129.     Plaintiff incorporates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

130.     From 2014 to the present, KeyPoint has worked as a contractor for OPM responsible for conducting background checks on federal applicants.  KeyPoint's employees were granted access to OPM's systems containing Plaintiff's and Class members' PII and other personal and/or sensitive data.

131.     KeyPoint owed Plaintiff and Class members a duty to take reasonable steps to maintain and protect against any dangers to Plaintiff's and Class members' PII and data

presented by cyber attackers.  This duty included, among other things, maintaining and testing KeyPoint's cyber-security systems, taking other reasonable security measures to protect and adequately secure the PII and data of Plaintiff and Class members from unauthorized access, and taking reasonable steps to ensure that hackers did not compromise KeyPoint employees' credentials.

132.    KeyPoint owed a duty of care to Plaintiff and Class members because they were foreseeable and probable victims of any of KeyPoint's inadequate cyber-security practices.  It was foreseeable that if KeyPoint did not take reasonable security measures, including protecting its OPM credentials, the PII and data of Plaintiff and Class members could be stolen.  KeyPoint knew or should have known that OPM employee data was an attractive target for cyber attackers, particularly in light of the prior data breaches experienced by the OPM and its contractors, and yet KeyPoint failed to take reasonable precautions to safeguard the PII and data of federal applicants and related non-applicants.

133.    In December 2014, the OPM announced that KeyPoint's cyber-security systems sustained a breach.  In that breach, cyber attackers were able to access KeyPoint's OPM credentials, which, according to Director Archuleta, facilitated the massive OPM Breach which compromised the PII and data of approximately 22 million individuals.

134.    By failing to implement necessary measures to protect KeyPoint's security credentials, KeyPoint departed from the reasonable standard of care and breached its duties to Plaintiff and Class members.

135.    But for KeyPoint's failure to implement and maintain adequate security measures to protect Plaintiff's and Class member's PII and data, and failure to adequately log security intrusions into its software systems, the PII and data of Plaintiff and Class members would not

have been stolen, Plaintiff and Class members would not have been injured, and Plaintiff and Class members would not be at a heightened risk of identity theft in the future.

136.    KeyPoint's negligence was a substantial factor in causing harm to Plaintiff and Class members.  As a direct and proximate result of KeyPoint's failure to exercise reasonable care and deploy reasonable cyber-security measures, the PII of Plaintiff and Class members was accessed by cyber attackers who can use the compromised PII to commit identity theft and a variety of serious frauds.

137.    As a result of KeyPoint's negligence, Plaintiff and Class members have suffered damages that have included or may include without limitation: (l) the loss of the opportunity to control how their PII and data is used; (2) the diminution in the value and/or use of their PII and data entrusted to the OPM and KeyPoint for the purpose of deriving employment from the OPM and with the understanding that the OPM and its contractors would safeguard their PII against theft and not allow access and misuse of their PII and data by others; (3) the compromise, publication, and/or theft of their PII and the PII and data of their family members, neighbors, and acquaintances; (4) out-of-pocket costs associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of financial and medical accounts; (5) lost opportunity costs associated with effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the OPM Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity and health care/medical data misuse; (6) costs associated with the ability to use credit and assets frozen or flagged due to credit misuse, including complete credit denial and/or increased costs to use credit, credit scores, credit reports, and assets; (7) unauthorized use of compromised PII and data to open new financial and/or health care or medical accounts; (8) the continued risk to their

PII, and the PII and data of their family members, neighbors, and acquaintances, which remains in KeyPoint and the OPM's possession and is subject to further breaches so long as KeyPoint and the OPM fail to undertake appropriate and adequate measures to protect the PII and data in its possession; and (9) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII and data compromised as a result of the OPM Breach for the remainder of the lives of the Class members and their families.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class, and award the following relief:

a.   that this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

b.   award Plaintiff and Class members appropriate relief, including actual and statutory damages;

c.   award equitable, injunctive, and declaratory relief as may be appropriate, including without limitation credit monitoring services and identity theft protection for the lifetime of the Affected Individuals, and an injunction requiring the U.S. government to re-issue free of charge any government-issued identification compromised by the OPM breach, such as Social Security numbers, passports, naturalization numbers, military service numbers, and visas;

d.   find that KeyPoint breached its duty to implement reasonable security measures to safeguard and protect Plaintiff's and Class members' PII and personal and/or sensitive data compromised in the OPM Breach;

e.   award all costs of prosecuting the litigation, including expert fees;

 f.  award pre- and post-judgment interest;

 g.  award attorneys' fees; and

 h.  grant such additional relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: October 2, 2015       Respectfully submitted,


        **COOPER & KIRK, PLLC**

        /s/ David H. Thompson
        David H. Thompson, Bar No. 450503
        dthompson@cooperkirk.com
        Peter A. Patterson, Bar No. 998668
        ppatterson@cooperkirk.com
        1523 New Hampshire Avenue, N.W.
        Washington, D.C. 20036
        Telephone: (202) 220-9600
        Facsimile: (202) 220-9601


        **KESSLER TOPAZ**
         **MELTZER & CHECK, LLP**
        Joseph H. Meltzer*
        jmeltzer@ktmc.com
        Naumon A. Amjed*
        namjed@ktmc.com
        Melissa L. Troutner*
        mtroutner@ktmc.com
        280 King of Prussia Road
        Radnor, PA 19087
        Telephone: (610) 667-7706
        Facsimile: (610) 667-7056

        *Attorneys for Plaintiff Ryan Bonner and the*
        *proposed Class*

        *\*pro hac vice* application forthcoming